Bent E. MORTENSEN and Lise Lotte Mortensen, his wife, Individually and on behalf of all other persons similarly situated, Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, an association organized under the laws of the United States and the State of New Jersey, et al., Appellees.

No. 75–2441.

United States Court of Appeals,
Third Circuit.

Argued Sept. 7, 1976.

Decided Jan. 20, 1977.

Robert H. Jaffe, Springfield, N. J., for appellants.

Franz J. Skok, Johnstone & O'Dwyer, Westfield, N. J., for appellees.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

Plaintiff mortgagors appeal from the dismissal of their civil antitrust suit against their mortgagee, First Federal Savings and Loan Association ("First Federal"), the mortgagee's law firm, Johnstone & O'Dwyer, and the directors of First Federal. Plaintiffs brought a class action alleging a conspiracy resulting in: 1) illegal tie-in of legal services in violation of the Sherman Act § 1, 15 U.S.C. § 1,[1] and 2) violations of Federal Home Loan Bank Board ("FHLBB") Regulations, 12 C.F.R. §§ 563.-35(a)(3), 571.7(b). District Court dismissed the Sherman Act claim for lack of federal jurisdiction, finding no showing that the alleged tie-in either was in or substantially affected interstate commerce. The claim under the FHLBB regulations was held to be within the primary jurisdiction of the federal agency and was dismissed without prejudice. Because we find sufficient allegations of interstate impact to withstand a pretrial motion to dismiss the Sherman Act claim for lack of subject matter jurisdiction, we vacate the dismissal of appellant's Sherman Act claim and remand for further proceedings consistent with this opinion.

## I.

In October 1972, the Mortensens contracted to buy a house in Westfield, New Jersey, and applied to First Federal for the mortgage. When a home buyer applies to First Federal for a first mortgage, a condition of the loan is that the applicant pay First Federal's attorney for the related legal services of examining and certifying title, drafting and recording the mortgage, and closing title in the buyer. Mechanically, the fee for these services is deducted from the amount of the loan. The applicant is not precluded from hiring his or her additional attorney, but will remain responsible in any event for First Federal's attorney's fees.

First Federal refers these legal services to defendant Johnstone & O'Dwyer, a New Jersey law firm.[2] In fact, such services could be performed only by New Jersey attorneys. If, however, home buyers consider title insurance a comparable substitute for a certificate of title, there is no intra-New Jersey restriction: any title company would theoretically be in a position to offer this service.[3]

---

1. Plaintiffs joined as an additional cause of action violations of New Jersey antitrust laws, 56 N.J.S. § 9–1 et seq. In light of our disposition of this case, it is unnecessary to discuss the pendent state claim, which will remain for the trial court.

2. Defendant Irvine B. Johnstone is alleged to have violated FHLBB regulation 12 C.F.R. § 571.7(b) by simultaneously being a partner in Johnstone & O'Dwyer and a member of First Federal's board of directors.

3. Mortensens proposed an amended complaint to add as a defendant Guardian Abstract Company, a title insurance company they allege is controlled by Johnstone & O'Dwyer and which is alleged to receive approximately 75% of the fees Johnstone & O'Dwyer charge First Federal's mortgage buyers. Johnstone & O'Dwyer

Appellants allege the fees charged by Johnstone & O'Dwyer for these services to be unreasonably high,[4] and, further, that procurement of a mortgage from First Federal is conditioned upon applicant's acceptance of those fees. Appellants do not allege that First Federal's mortgage offer is more attractive than other mortgages.[5] There may be some 494 lending institutions with offices in New Jersey competing for the home mortgages given by First Federal; out-of-state lenders can also compete for the mortgages given on New Jersey homes.

Some of those lending institutions follow what is called an "open attorneys" plan, under which the mortgage applicant is permitted by the lender to choose his or her own counsel for the title examination and closing. In that case, the applicant pays the selected counsel directly, and the lender plays no role in the provision or payment of those particular legal services. The lender charges a fee to review the title. Other lending institutions, among them First Federal, prefer to rely on their own general counsel for these matters, and follow what is referred to as a "closed attorneys" plan.[6]

First Federal has always relied on Johnstone & O'Dwyer to perform these legal services, expressing confidence in their work. Johnstone & O'Dwyer is paid on a case-by-case basis and receives no annual retainer from First Federal. On its part, First Federal receives no "kickback" from its referrals to Johnstone & O'Dwyer. In every case, the mortgage applicant is the one who pays for Johnstone & O'Dwyer's legal services. Plaintiffs claim that in the four-year period preceding this suit, Johnstone & O'Dwyer (and Guardian, the controlled title company) may have received some $1,000,000 in legal fees from First Federal's mortgage-related legal services.

According to First Federal, the legal services are rendered to and for First Federal, not the home buyer. Appellants contend just the reverse: the legal services are rendered to and for the mortgage applicants (as they would be in an "open attorneys" plan) and they are consequently being forced to buy the legal services selected by First Federal. The trial court adopted the latter contention for the purpose of deciding the jurisdictional issue.

First Federal is prohibited, by 12 C.F.R. §§ 545.6–6 from giving mortgages on homes outside New Jersey unless the out-of-state properties are within 100 miles of First Federal's home office. The home office is in Westfield, New Jersey. Although some parts of New York state are within 100 miles of Westfield, of its 3,462 mortgage loans still open as of December 7, 1973, not one was secured by out-of-state real property.

Although its home mortgage activity is thus virtually confined to New Jersey, there are apparently several interstate contacts: 1) First Federal is a federally character institution, and, as such, governed by federal regulations; 2) substantial funds used by First Federal for its loans come from the FHLBB as loans to First Federal;[7] 3) the

admit that they set up Guardian for federal income tax purposes.

4. Mortensens applied for a $43,000 mortgage; legal fees by Johnstone & O'Dwyer amounted to $540. Based on their sampling of First Federal's files, appellants contend that Johnstone & O'Dwyer's fees for these mortgage-related services are "artificially pegged to the cost of the real estate purchased with a minimum fee of $375 and a maximum fee of $550." Brief of Appellant at 7.

5. What appellants do try to argue is that because it is a mortgage the loan is "unique":
. . . [A]pproval by [First Federal] of the loan application . . . satisfies the mortgage contingency provisions of most residential real estate purchase agreements. Thus, the applicant is ordinarily obligated to consummate the purchase on the residential real estate under contract.
Brief of Appellant at 16.

6. We take note of the recently enacted New Jersey statute that may have ended the "closed attorneys" plan, 46 N.J.S. 10A–6 (effective Jan. 7, 1976).

7. First Federal's Statement of Condition dated December 31, 1972 indicates some $9,000,000 in advances from FHLBB for residential mortgages. On December 31, 1974, the figure was $8,100,000.

amounts of mortgage funds provided by First Federal's own savings deposits are insured by Federal Savings and Loan Insurance Corporation ("FSLIC"); 4) a number of the loans made by First Federal are guaranteed by federal or other out-of-state agencies or corporations;[8] and 5) at the time of mortgage application many buyers are from outside New Jersey.[9]

In addition to First Federal's interstate contacts, the Mortensens point to out-of-state competitors for both the mortgage transaction and the title certificate, and to potential deterrent of out-of-state customers considering homes, in New Jersey. Appellants contend in particular that New York banks compete for mortgage loans in First Federal's territory. Assuming that buyers consider title insurance an adequate substitute for title examinations by attorneys, there would of course be out-of-state competition for a significant part of the allegedly tied service.[10] The final point, the impact on the flow of out-of-state New Jersey home seekers, is more difficult to assess, since it is not clear from the record what proportion of New Jersey lenders operate under the "closed attorneys" plan. Moreover, not all New Jersey lenders are implicated, only First Federal.

Mortensens instituted this action in December, 1973. Discovery proceedings commenced; in December, 1974, plaintiffs moved for class action certification, and in January, 1975 moved to amend their complaint in order to add Johnstone & O'Dwyer's title company, Guardian Abstract Company. In February, 1975, defendants responded with motions to dismiss plaintiffs' complaint pursuant to Fed.R. Civ.P. 12(b)(1) for lack of subject matter jurisdiction; to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted; to stay the proceedings pending exhaustion of administrative remedies; and, in the alternative, to grant summary judgment under Fed.R. Civ.P. 56 in favor of defendants.

A single hearing was held, in April, 1975, on the above motions. Plaintiffs' attorney opened with his arguments favoring class action certification according to Fed.R. Civ.P. 23. When the judge asked how many lending institutions accept customer-chosen attorneys for closing, plaintiffs' counsel responded "I felt we didn't have to make all our proof here . . . ," and proceeded with his proof of class action status.[11]

The defendants' attorney, a member of the Johnstone & O'Dwyer firm, asserted that all the relevant facts were then before the court and that, consequently, the matter was ripe for summary judgment. The "central" issue, according to defendants' attorney, was whether Johnstone & O'Dwyer performed any legal services for First Federal's borrowers; the answer strenuously urged was "no," that the services were rendered to First Federal and not to the customers. In addition, defendants' attorney argued that the fees charged by Johnstone & O'Dwyer were not unreasonable. On the merits of the tying claim, defendants' attorney discussed a recent case dealing with a nearly identical practice in Louisiana, in which the district court held that there was no illegal tie-in because there were not two

---

8. For instance, the minutes of First Federal's board of directors' meeting dated February 19, 1976, list under "mortgages granted" three mortgages insured by Mortgage Guaranty Insurance Corporation of Milwaukee, Wisconsin.

9. Appellants examined twenty-eight loan files representing every 75th file during the four-year period prior to suit; of those twenty-eight, seven applications were initiated by out-of-state residents.

During oral argument appellants mentioned that "several" closings took place out-of-state.

10. Johnstone & O'Dwyer allegedly "turn over" 75% of its mortgage-related legal fees to their title company, Guardian.

11. At one point plaintiffs' attorney remarked "We are here on a motion for class action determination." A hearing on the class action motion had been scheduled for January, 1975, but was then postponed to coincide with the hearing on defendants' motions. Plaintiffs' attorney seemed unsure of the nature of the attack that would be made by defendants, saying "I am not really going to try to answer at this point the motion for summary judgment. I would like to reserve that for rebuttal."

products, simply the one product of the loan with its related services.[12] In contradiction to plaintiffs' attorney, the defendants' attorney contended that First Federal's practice was thoroughly approved by the FHLBB regulations. Defendants' attorney responded to the class action certification request. He closed his argument without mentioning the jurisdictional issue. Plaintiffs' attorney had not earlier mentioned the jurisdictional issue and did not mention it on rebuttal.

It was not until the close of the hearing, after the judge said he would take the case under advisement and would write an opinion, that jurisdiction may have been considered.[13] The judge asked "Can anyone tell me what part of the market the defendant has?" No one could; promises were made to send the information in later, but the record does not show that this was done.

In August, 1975, the district court filed an opinion dismissing the Sherman Act claim for lack of subject matter jurisdiction, and granting leave to renew the FHLBB claim after exhaustion of the appropriate administrative remedies. In its consideration of subject matter jurisdiction, the court went through a two-step analysis: first, did defendants' conduct occur in interstate commerce, and, second, if it did not, did it nevertheless substantially affect interstate commerce.

In examining the conduct under the first prong, the court asserted that

plaintiffs' claim to having satisfied the first standard rests upon the facts that (1) the Association [First Federal] obtains both investment funds and depositors' insurance from interstate sources and some of its customers' loans are guaranteed by federal agencies and enterprises based without the State, (2) perhaps 25% of its customers originate their loans while residing outside New Jersey, and (3) it competes in the local real estate financing market with New York lending institutions.

Appendix at 285a–286a.

Finding real estate financing to be "essentially a local enterprise,"[14] the trial judge commented that "[a]n entity engaged in such activities is not brought within the flow of interstate commerce merely because it incidentally purchases supplies in interstate commerce, or because its customers travel in interstate commerce, or because it is situated in an area of interstate activity," and concluded "without great difficulty" that the transactions involved here are not *in* interstate commerce.

As for whether or not these transactions substantially affect interstate commerce, the trial court understood the relevant inquiry to be "whether, considering the nature of the restraint alleged to exist and the circumstances surrounding it, the conduct of which plaintiffs complain will probably affect the flow of interstate goods or service," relying *inter alia* on our opinions in *Doctors, Inc. v. Blue Cross of Greater*

12. *Forrest v. Capital Bldg. & Loan Ass'n*, 385 F.Supp. 831 (M.D.La.1973), aff'd, 504 F.2d 891 (5th Cir. 1974), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). The Fifth Circuit affirmed a holding on the merits—that there was but a single product. Neither it nor the district court dealt with the jurisdictional issue, even though a motion to dismiss for lack of jurisdiction was before the district court.
    Because a motion to dismiss for lack of subject matter jurisdiction attacks the power of a court to enter any ruling on the merits, the jurisdictional issue is generally decided prior to the entry of judgment on the merits. In *Forrest* the district court said it would consider two of the claims on the merits (one being the single product issue) and that a treatment of those issues on the merits would "moot the need" to treat the jurisdictional issue. 385

F.Supp. at 835. Thus *Forrest* provides no illumination on our jurisdictional issue.

13. The questions appear to relate only to the merits of tie-in claim, but their focus plays a part in the opinion dismissing the claim for lack of subject matter jurisdiction.

14. Found at Appellant's Appendix, p. 286a (unpublished opinion), with a footnote citing *Stavrides v. Mellon Nat'l Bank & Trust Co.*, 353 F.Supp. 1072, 1075 (W.D.Pa.1973); *Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n*, 365 F.Supp. 975, 981 (E.D.Pa.1973); *Beck v. Athens Building Loan & Savings Ass'n*, 65 F.R.D. 691, 693 (M.D.Pa.1974); and *Spens v. Citizens Fed. Sav. & L. Ass'n of Chicago Heights*, 364 F.Supp. 1161, 1163 (N.D.Ill.1973).

*Philadelphia*, 490 F.2d 48 (3d Cir. 1973), and *United States v. Mazzei*, 521 F.2d 639 (3d Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

The trial court considered unpersuasive an argument that because Johnstone & O'Dwyer's fees were excessive, the flow of buyers from outside New Jersey would be impeded, as would be the flow of related goods and services. To support its finding that those effects are not likely to result here, the trial court relied on the following factors: 1) First Federal is a single lender with little or no market power in the area of credit; 2) plaintiffs do not allege that First Federal has the ability or intent to raise prices or eliminate competitors in any relevant credit market; 3) plaintiffs do not allege any conspiracy between First Federal and any other lender, distinguishing this from *Stavrides v. Mellon Nat'l Bank & Trust Co.*, 353 F.Supp. 1072 (W.D.Pa.1973); *Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n*, 365 F.Supp. 975 (E.D.Pa. 1973); and *Beck v. Athens Building Loan & Savings Ass'n*, 65 F.R.D. 691 (M.D.Pa.1974); 4) plaintiffs do not allege uniquely attractive credit offered by First Federal, *see Fortner v. U. S. Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); 5) any decreased competition in the tied products market would have a *de minimis* effect at most on the demand for credit and building supplies, and a purely local effect on competition in the legal services market; 6) no plaintiff is involved in an interstate mortgage transaction, distinguishing this from *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); and 7) no competitor of Johnstone & O'Dwyer is alleged to be making interstate purchases whose flow will be disrupted by First Federal's activities, distinguishing this from our opinion in *Doctors, Inc., supra.* Because the trial court found defendant's activities to be neither in nor substantially affecting interstate commerce, it dismissed plaintiffs' Sherman Act claim for lack of federal subject matter jurisdiction.

As for the second federal claim, alleging violations of FHLBB regulations, the dis-trict court found this to be an area within the primary jurisdiction of the FHLBB. Accordingly, this claim was dismissed without prejudice to a right to renew the claim after consideration by the appropriate federal agency. The remaining pendent state claim was also dismissed by the trial court, relying on its discretion under *United Mineworkers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## II.

### A.

The novel issue before us is the propriety of treating a motion to dismiss a Sherman Act claim for lack of subject matter jurisdiction in the same manner as other claims whose jurisdictional bases are not as intertwined with their merits. We hold that the trial court erred in its premature dismissal of plaintiff's claim, particularly because the nexus of interstate commerce necessary to sustain jurisdiction is inextricably related to the interstate effects plaintiffs will have to establish to succeed on the merits of this tying claim brought not under the Clayton Act § 3, 15 U.S.C. § 14, but under Sherman §§ 1 and 2.

Motions to dismiss on the pleadings, pursuant to Fed.R.Civ.P. 12, are often confused with each other: it is frequently unclear whether the trial court has dismissed under Rule 12(b)(1) or 12(b)(6), and even more importantly whether, if it was a 12(b)(6) proceeding, outside matters have been considered, thus converting the procedure into a Rule 56 summary judgment. *See* Fed.R. Civ.P. 12(b) (last sentence). The differences among these procedures are vital, however, especially when the claim subject to dismissal arises under the Sherman Act.

■ In § 1 of Sherman the jurisdictional basis and an element of the violation are both found in one phrase: "in restraint of trade or commerce among the several States." 15 U.S.C. § 1. That the same phrase is both an element of the offense and a vital prerequisite for federal court

jurisdiction has caused considerable confusion.[15] Today we consider the effect of that double role assigned to the interstate commerce nexus on traditional procedures under Fed.R.Civ.P. 12.

The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations, he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure. Here there are further safeguards for the plaintiff: in addition to having all of plaintiff's allegations taken as true, with all their favorable inferences, the trial court cannot grant a summary judgment unless there is no genuine issue of material fact.

The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.[16]

The effect of the above procedure on Sherman Act claims is, disturbing. If a court tests the sufficiency of interstate allegations under Fed.R.Civ.P. 12(b)(6) on the pleadings alone, the plaintiff need only have pleaded a sufficient nexus with interstate commerce, and will not be forced to prove those allegations at a pretrial stage. And if the court does go beyond the pleadings, it still must take plaintiff's allegations as true. In addition, the court cannot enter judgment if it appears that there is a material issue of disputed fact, but must await discovery and trial, during which plaintiff will have the opportunity to prove those material facts. But if this same nexus of interstate commerce is attacked as insufficient to provide jurisdiction in fact, rather than under rule 12(b)(6), the plaintiff must either prove the truth of the alleged nexus or stand by while the court evaluates those allegations in the same way a jury would evaluate that nexus as part of plaintiff's case on the merits, or as a court would in considering summary judgment.

This 12(b)(1) factual evaluation may occur at any stage of the proceedings,

---

**15.** *See* P. Areeda, *Antitrust Analysis* ¶ 183 (2d ed.1974).

**16.** *See* 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1350 (1969). The form of the inquiry is flexible though: "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck,* 307 U.S. 66, 71–72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939). That the district court is free to determine facts relevant to its jurisdiction has long been clear. *See, e.g., Wetmore v. Rymer,* 169 U.S. 115, 18 S.Ct. 293, 42 L.Ed. 682 (1898).

from the time the answer has been served [17] until after the trial has been completed. It is a combination of the timing of the factual jurisdictional attack, the plaintiff's having the burden of proof, and the court's having a free hand in evaluating jurisdictional evidence that can unfairly preclude Sherman Act plaintiffs from reaching the merits of their cases. And it is because the nexus they will have to establish to succeed on the merits is at least in part the same nexus they must allege or even prove to withstand jurisdictional attacks, that we feel it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage. In the case *sub judice,* for instance, the plaintiffs had alleged substantial interstate connections and effects. This is not to say that the trial court may never prop-

erly dismiss a Sherman Act claim on a factual 12(b)(1) motion. In an unusual case it may be clear that plaintiffs would not be able to prove the necessary interstate nexus. In the case before us, however, that inability is not apparent from the record.

### B.

#### 1.

Because this precise issue has not previously been before us, and because other Circuits have considered it, and with varied results, we think it worthwhile to outline briefly what other Circuits have been saying on the propriety of dismissing Sherman Act claims for lack of subject matter jurisdiction at a pretrial stage when relevant facts are in dispute, and relevant discovery has not been completed.[18] The Fourth Cir-

**17.** A factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted.

**18.** In *Doctors, Inc. v. Blue Cross,* 490 F.2d 48 (3d Cir.1973), the defendant had filed a 12(b)(1) motion prior to filing an answer, so plaintiffs' jurisdictional allegations were entitled to a presumption of truthfulness. The district court in *Doctors* dismissed the complaint; on appeal we reversed, finding sufficient allegations of interstate impact to confer subject matter jurisdiction, taking plaintiff's allegations as true.

The other Sherman Act case in our circuit implicating Fed.R.Civ.P. 12(b)(1) did not in fact turn on subject matter jurisdiction. In *Winkleman v. New York Stock Exchange,* 445 F.2d 786 (3d Cir.1971), the trial court granted a motion to dismiss the complaint. The only such motion by defendant was a 12(b)(1) lack of subject matter jurisdiction motion. It was apparent on appeal, however, that the district court had actually considered the motion as made under Rule 56. 445 F.2d at 788. Because plaintiffs were given no opportunity to argue or brief the motion to dismiss, we reversed. As stated by Judge Adams, in *American Motors Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (3d Cir.1975): "One of the basic tenets of American jurisprudence is that procedural fairness requires that each party have notice of the issues involved and an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 1244. We do have some concern, in the present case, that appellants did not have this opportunity.

Our most recent Sherman case, *Evans v. S. S. Kresge Company,* 544 F.2d 1184 (3d Cir., filed Nov. 2, 1976), did involve a dismissal for want of subject matter jurisdiction, but one

granted on a motion for summary judgment, since both parties agreed there were no issues of material fact. Thus, a stage in pretrial discovery and other proceedings had thus been reached where all the relevant facts were agreed upon.

Apart from Sherman Act claims, though, we have frequently had the opportunity to discuss the proper standards for dismissals under Rule 12(b)(1). For example, in dealing with dismissals for lack of diversity jurisdiction, we have said that if the plaintiff "fails to bring forth any factual material to support his claim of jurisdiction, then dismissal may properly be granted against him. However, it should clearly appear from the record that plaintiff has had an opportunity to present facts . . . that diversity was not manufactured." *Groh v. Brooks,* 421 F.2d 589, 594 (3d Cir.1970). *See also Tanzymore v. Bethlehem Steel Corp.,* 457 F.2d 1320 (3d Cir.1972); *Nelson v. Keefer,* 451 F.2d 289 (3d Cir.1971). We have also discussed 12(b)(1) dismissals in nondiversity cases. In *Local 336, American Federation of Musicians, AFL–CIO v. Bonatz,* 475 F.2d 433 (3d Cir.1973), we reversed the dismissal of a complaint that requested enforcement of an arbitration award. There, during argument on a motion for summary judgment, the court raised *sua sponte* the issue of subject matter jurisdiction. Judge Gibbons wrote that while the trial court does have significant latitude in determining matters of its own jurisdiction,

we have never departed from the rule that even on such an issue the record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention.

cuit, in *Hospital Building Co. v. Rex Hospital,* 511 F.2d 678 (4th Cir.1975), *rev'd,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), was unsure whether it was reviewing a dismissal granted under Fed.R.Civ.P. 12(b)(1) or 12(b)(6). Because it was dealing with a Sherman Act claim, the court decided that "the better analysis [would be] to treat an insufficient plea of effect upon interstate commerce as a failure to state a claim upon which relief can be granted rather than lack of jurisdiction (in the sense of power) over the subject matter." 511 F.2d at 681. The only reason given for this "better analysis," though, was that Congress had conferred exclusive jurisdiction in the federal courts for Sherman Act claims. Despite the resulting greater distaste for judgments on the pleadings than for subject matter dismissals, the Fourth Circuit did affirm the dismissal in that case, as the exception. *Id.* at 680–81, *rev'd,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) ("substantially affect" incorrectly applied). Judge Winters, dissenting from the Fourth Circuit's opinion, wrote that the complaint should not have been dismissed on the pleadings; plaintiff should have an opportunity to establish the jurisdictional allegations "if not at trial, at least by a *prima facie* showing . . . ." 511 F.2d at 686 (dissent).

The Fifth Circuit has treated this issue on several occasions. In *McBeath v. Inter-America Citizens for Decency Committee,* 374 F.2d 359 (5th Cir.), *cert. denied,* 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967), the district court granted a motion to dismiss a Sherman Act claim for lack of subject matter jurisdiction. On appeal, the dismissal was reversed as premature because "where the factual and jurisdictional issues are completely intermeshed the juris-

dictional issues should be referred to the merits, for it is impossible to decide the one without the other." *Id.,* at 363. In particular, the requisite effect on interstate commerce was "so inextricably connected with the merits of the case itself" that it was error for the court to dismiss without allowing the plaintiff a full opportunity to prove his case on the merits. *Id.*

On the other hand, the Fifth Circuit did affirm a Fed.R.Civ.P. 12(b)(1) dismissal of a Sherman Act claim in *Rosemound Sand & Gravel v. Lambert Sand & Gravel,* 469 F.2d 416 (5th Cir.1972). But there, the court emphasized, plaintiff did have ample opportunity to argue his jurisdictional position. Despite the opportunity, plaintiff had only the barest conclusory allegations in his complaint, with little to buttress them. Again, in *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39 (5th Cir.1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), the court returned to disapproval of Sherman Act dismissals, for lack of sufficient interstate effects, .at early stages of the proceedings.[19] The court explained that "[b]ecause the facts are not fully developed, subject-matter jurisdiction under §§ 1 and 2 cannot be conclusively determined at this stage of the proceedings." *Id.* at 47.

The Seventh Circuit reversed a dismissal for lack of subject matter jurisdiction in *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Association,* 484 F.2d 751 (7th Cir.1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). After stating the proper test for establishing sufficient impact on interstate commerce to support jurisdiction, the court concluded:

> We hold that such a conclusion can better be determined after a thorough

---

*Id.* at 437. *See also Lasher v. Shafer,* 460 F.2d 343 (3d Cir.1972) (Civil Rights Act claim).

**19.** The discussion on appeal was somewhat spontaneous as the district court had entered a judgment on the merits, under Fed.R.Civ.P. 12(b)(6). The appellate court said it was confirming that the district court had jurisdiction.

The hesitancy of some district courts to confront this tricky jurisdictional issue is also exemplified in the one case, also in the Fifth

Circuit, that dealt with a claim on the merits quite similar to the one *sub judice, Forrest v. Capital Buildings & Loan Association,* 504 F.2d 891 (5th Cir.1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). In *Forrest,* defendant did make a 12(b)(1) motion but the trial court skipped to a decision against plaintiff on the merits, saying the jurisdictional issue was therefore moot. 385 F.Supp. at 835, *aff'd,* 504 F.2d 891 (5th Cir.1974).

exploration of all evidence that either side can produce, rather than by a motion to dismiss, particularly when based on conflicting affidavits.

*Id.* at 759. The court warned that there should not be a dismissal in those circumstances "unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." *Id. See also United States v. Finis P. Ernest, Inc.,* 509 F.2d 1256, 1258 (7th Cir.), *cert. denied sub nom. Modern Asphalt Paving & Construction Co. v. United States,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975) (separate appeals).

We turn last to the Ninth Circuit opinions in *Rasmussen v. American Dairy Association,* 472 F.2d 517 (9th Cir. 1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); and *Gough v. Rossmoor Corp.,* 487 F.2d 373 (9th Cir. 1973). In *Rasmussen,* the trial court dismissed the complaint, after a summary judgment hearing, for lack of subject matter jurisdiction. This ruling was reversed on appeal, with the court stressing that it was dealing only with the jurisdictional issue. The *Rasmussen* court

bifurcated the import of "restraint of trade or commerce among the several States" into 1) the restraint, quite apart from any interstate nexus, and 2) the effect interstate of that restraint. The first part—the analysis on the merits—is centered on commonly understood undesirable restraints; the second—a constitutional requirement—is to ensure that Congress, and derivatively the federal courts, has power to act against that restraint.[20]

We have spent some time describing these various approaches by other circuits to show that substantial confusion has been understandably generated by the difficulties of separating out the jurisdictional nexus from factual issues that go to the merits of the claim. It seems that Fed.R.Civ.P. 12(b)(1) factual (as opposed to merely facial) motions to dismiss for lack of jurisdiction cannot satisfactorily be treated the usual way, when a Sherman Act claim is involved.

2.

In the face of the varied approaches taken by different circuits, we would hope to find illumination in Supreme Court pro-

---

**20.** In *Gough, supra,* the same court reversed a dismissal for lack of jurisdiction that was based on the jury's finding of insufficient effect on interstate commerce. The Ninth Circuit held it error to submit the jurisdictional issue to the jury, and, again, the court explained the separateness of the merits issue and the jurisdictional one.

Thus the Ninth Circuit's approach to the interrelation of Sherman Act claims' merit and their jurisdictional prerequisite differs greatly from that in the other circuits discussed. The Fourth Circuit, in *Hospital, supra,* preferred to treat a Sherman motion to dismiss for lack of jurisdiction as a motion on the merits under Fed.R.Civ.P. 56. 511 F.2d at 680–81 ("better" to treat an insufficient plea of effect on interstate commerce as a failure to state a claim).

As early as *McBeath, supra,* the Fifth Circuit held that the factual issues on the merits in a Sherman Act claim are inseparable from the factual issues on the jurisdictional question. As a result, the court held that plaintiff should be given full trial opportunities to establish those facts, rather than having the trial court evaluate jurisdiction at a more usual early stage under Rule 12(b)(1).

An even more intriguing approach is one described, but not adopted, in *Finis P. Ernest,*

*Inc., supra,* by the Seventh Circuit: where a *per se* violation (such as price-fixing) is alleged the court could skip the usual "in or affecting commerce" jurisdictional test. This view implicitly equates the interstate nexus required for jurisdiction with that required for success on the merits. For cases so holding within the Seventh Circuit see *U. S. Dental Inst. v. American Ass'n of Orth.,* 396 F.Supp. 565 (N.D.Ill. 1975) (can determine jurisdiction better after all evidence is in; for 12(b)(1) court should assume jurisdiction exists unless effect on interstate commerce is clearly non-existent); *Mar-Farr Corp. v. Copley Press, Inc.,* 64 F.R.D. 456 (N.D.Ill.1974) (should not grant 12(b)(1) when unsure of effect on interstate commerce). Because those effects need not be proven for success on the merits, the facile conclusion is that "[i]t may be anomalous to require proof of effects to satisfy jurisdiction in those cases where proof of effects is not necessary to establish the substantive offense." 509 F.2d at 1259 (emphasis added). Even a leading antitrust commentator poses that question. *See* P. Areeda, Antitrust Analysis, ¶ 183 at 122 (2d ed. 1974). This seems to ignore the constitutional requirement of jurisdiction entirely.

nouncements, even though that Court has not been squarely presented with this issue.[21] The most helpful case, for our purposes, is the recent decision in *Hospital Building Co. v. Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), which, incidentally, was handed down subsequent to the district court's opinion in the case *sub judice.*

In *Hospital,* defendants responded to Sherman Act claims by moving to dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The same nexus was at issue in both motions: if the requisite effect on interstate commerce had not been alleged then the complaint should be dismissed for both lack of jurisdiction and failure to state a claim. Because the allegations in the complaint were not controverted, they were entitled to the same presumptive truthfulness in both motions. The district court dismissed the case; on appeal this was affirmed by the Fourth Circuit, as a dismissal under Fed.R.Civ.P. 12(b)(6).[22] Justice Marshall,

---

**21.** The Court has, however, faced related issues several times. In *United States v. Women's Sportswear Mfrs. Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949), the nexus of interstate commerce necessary to success on the merits had been found insufficient after a trial. The Court reversed, because the trial court had not considered whether the intrastate conduct could have had sufficient interstate effects.

A dismissal of a Sherman Act complaint for failure to state a cause of action was reversed in *United States v. Employing Plasterers,* 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954). The trial court had found "no allegation of fact which showed that these powerful local restraints had a sufficiently adverse effect on the flow of plastering materials into Illinois." 347 U.S. at 188, 74 S.Ct. at 454. The Supreme Court disagreed:

> The complaint plainly charged several times that the effect of all these local restraints was to restrain interstate commerce. Whether these charges be called "allegations of fact" or "mere conclusions of the pleader," we hold that they must be taken into account in deciding whether the Government is entitled to have its case tried.
>     . . . [I]t goes too far to say that the Government could not possibly produce enough evidence to show that these local restraints caused unreasonable burdens on [interstate commerce].

*Id.* at 188–89, 74 S.Ct. at 454.

A grant of summary judgment for defendants was reversed in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), not only because the plaintiff should be viewed favorably in any summary judgment but also because

> summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long

has been the hallmark of "even handed justice."

*Id.* at 472–73, 82 S.Ct. at 491.

When the trial court in a non-jury trial found defendant's interstate nexus insufficient on the merits, the Supreme Court reversed in a brief per curiam in *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), finding the requisite nexus because the intrastate territorial division "almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers . . . ." *Id.* at 322, 88 S.Ct. at 444.

In the current leading tie-in case, *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Court again reversed the grant of summary judgment for defendants. The Supreme Court explained that not only had the district court misunderstood the legal principles on the merits, it had also "misconceived the extent of its authority to evaluate the evidence in ruling on this motion for summary judgment." *Id.* at 499, 89 S.Ct. at 1257. The Court then quoted from *Poller, supra,* that summary procedures should be used sparingly in antitrust litigation.

Although it did not involve a tie-in claim, *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), did concern the interstate nexus sufficient to support jurisdiction. The trial court in *Goldfarb* conducted a hearing on the issue of liability during which it disposed of defendant's "defense" of insufficient effect on interstate commerce. The Supreme Court agreed, that the alleged intrastate restraint "*may* substantially affect commerce." *Id.* at 785, 95 S.Ct. 2004 (emphasis added).

**22.** The appellate court, finding ambiguity in whether the court below had granted dismissal under Fed.R.Civ.P. 12(b)(1) or 12(b)(6), regarded the dismissal as having been under 12(b)(6). As a general rule if there is a jurisdictional defect as well as an insufficiency on the merits, the correct procedure is to treat a dismissal as having been on the jurisdictional ground for the obvious reason that if the court lacks jurisdiction to hear the case then *a fortiori* it lacks jurisdiction to rule on the merits.

however, noted that whether the dismissal was under Fed.R.Civ.P. 12(b)(1) or 12(b)(6), the Court's analysis would be the same: "In either event, the critical inquiry is into the adequacy of the nexus between respondents' conduct and interstate commerce that is alleged in the complaint." *Id.* at 742, n. 1, 96 S.Ct. at 1851. After an examination of the interstate allegations, the Court considered the timing and procedural nature of the lower court's dismissal, saying:

> We have held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962), *dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.* Applying this *concededly rigorous standard,* we conclude that the instant case is not one in which dismissal should have been granted. Petitioner's complaint states a claim upon which relief can be granted under the Sherman Act.

*Id.* at 746–47, 96 S.Ct. at 1853–54 (emphasis added) (footnote omitted).[23] Because the *Hospital* Court conceded at the outset that its analysis in this case would be no different if the Court regarded the dismissal as having been for lack of subject matter jurisdiction, we can conclude that the "concededly rigorous standard" would apply equally in dismissals pursuant to Fed.R.Civ.P. 12(b)(1), and that dismissals of Sherman Act claims prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. Thus, it seems that *Hospital* cuts against dismissal of this Sherman Act claim for lack of subject matter jurisdiction. We feel that sufficient interstate factors were alleged to withstand the pretrial motion for dismissal for lack of subject matter jurisdiction in this case.

### C.

■ Subject matter jurisdiction in a Sherman Act claim is based on a finding either that the conduct in question is itself in interstate commerce or that whether or not the conduct is in interstate commerce it nevertheless substantially affects interstate commerce. The trial court applied both tests and found insufficient interstate factors to support jurisdiction. As in *Kresge, supra,* and *Doctors, supra,* we will consider only whether the alleged restraint "substantially affects" interstate commerce.[24] In so doing, we see no reason to consider only a few allegations for the "in commerce" test and the rest for the "affecting" test, as the trial court did, thereby depriving plaintiffs of several significant contacts in the "affecting" test. Consequently, we will take note of all the interstate contacts alleged.

The obvious case to begin with is *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), since the conduct there was also legal services relating to home title closings. The legal practices involved were themselves performed wholly intrastate, but the Court nevertheless found jurisdiction. It did this by viewing the legal services as "an integral part" of the home mortgages. The mortgages were called interstate transactions because 1) roughly half of them were granted by out-of-state lenders, to finance the purchase of Virginia homes and 2) many of the loans were insured by out-of-state agencies.

In the case at hand, none of the mortgages were granted by out-of-state lenders al-

---

**23.** The Court's footnote 5 reads as follows:

5. It may of course be that even though petitioner's complaint adequately alleges an effect on interstate commerce, further proceedings in this case will demonstrate that respondents' conduct in fact involves no violation of law, or indeed no substantial effect on interstate commerce. Cf. *United States v. Oregon State Medical Society,* 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

**24.** *See Evans v. S. S. Kresge Co., supra* at 1188.

though an alleged twenty-five percent of the customers were from out of state at the time they applied for loans from First Federal. Appellants urge that these loans are interstate transactions because First Federal obtains a significant portion of its loan funds from out-of-state sources. That, however, is one step removed from the interstate nature of the mortgages in *Goldfarb* which were between Virginia home buyers and non-Virginia banks.[25] Ultimately all loan funds have out-of-state sources. Because the loans themselves are thus not as clearly interstate transactions as they were in *Goldfarb*, we will look at the interstate effect of First Federal's lending practices. This approach was also taken in *Hospital, supra*, where the Supreme Court considered the entire list of interstate factors, and, without singling any out, said: "This *combination of factors* is certainly sufficient to establish a 'substantial effect' on interstate commerce . . . ." at 744, 96 S.Ct. at 1852. (emphasis added).

We are also not unmindful of the Court's dicta in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), to the effect that the intended jurisdictional reach of § 1 of Sherman is the "utmost extent" of Congress's power under the commerce clause. In fact, the Court in *Hospital* noted that although the Congress of 1890 took a narrow view of its power under the commerce clause, "[s]ubsequent decisions by this Court have permitted the reach of the Sherman Act to expand along with expanding notions of

congressional power. See *Gulf Oil [supra]*." at 743, n. 2, 96 S.Ct. at 1852.

So we are faced with two considerations, both of which militate against early 12(b)(1) dismissals of Sherman Act claims: 1) the intertwined nature of the two sets of facts necessary for jurisdiction and the merits; and 2) an apparent increase in the jurisdictional reach of the Sherman Act, meaning that less substantial effects would be necessary to support jurisdiction.[26] With this in mind, we turn to the factors rejected by the trial court.

■ The nexus between First Federal's alleged tie-in and interstate commerce is composed of, *inter alia*, the following factors: 1) First Federal is federally chartered and subject to federal regulation; 2) those regulations may prohibit the very activity complained of; 3) New York lenders compete for the mortgages, the alleged tying product; 4) out-of-state title companies may compete as a substitute for the title searches, the alleged tied product; 5) a considerable part of First Federal's loan funds is lent to First Federal from out-of-state; 6) many of the mortgages made by First Federal are insured by out-of-state institutions; 7) the alleged tie-in may place an unreasonable burden on the flow of home buyers, and related goods and services, into New Jersey; and 8) perhaps one-fourth of the mortgages are initiated by out-of-state mortgagors.[27]

We think that the combination of these factors is sufficient to withstand a pretrial jurisdictional attack in this case. Many of

---

**25.** On the other hand, the conduct at issue in *Goldfarb* was one step removed from the lending institution, which is not the case here.

**26.** Still, we hesitate to conclude that all restraints would confer subject matter jurisdiction. Two cases that we specifically approved in *Doctors, supra*, as properly holding the conduct to be without the reach of Sherman can be distinguished on the first consideration. In *Lieberthal v. North Country Lanes*, 332 F.2d 269 (2d Cir. 1964) plaintiff's allegations were uncontested, thus giving the plaintiff the benefit of those and their favorable inferences—questions of disputed fact did not arise. In *Page v. Work*, 290 F.2d 323 (9th Cir.), *cert. denied*, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961),

plaintiff was given that advantage, since the court treated it as a Rule 56 motion, and the additional one of having the jurisdictional issue decided *after* a trial on the merits.

**27.** We distinguish *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), where the Court held the Chicago cabs not brought within interstate commerce merely because interstate travelers used the local cabs, on the grounds that the home mortgages here are an essential part of a customer's move into New Jersey. *See Goldfarb, supra*, 421 U.S. at 784 n.13, 95 S.Ct. 2004.

the facts were still in dispute, and an evaluation of them by the court was premature.[28]

## III.

■ The second issue on appeal is whether the trial court was correct in ruling that the FHLBB regulations claim is within the primary jurisdiction of the FHLBB. On this issue we agree with the trial court.

The Mortensens assert violations of two regulations, 12 C.F.R. §§ 563.35(a)(3) and 571.7(b). Section 563.35(a) provides:

§ 563.35 Certain conditions prohibited.

(a) No insured institution or director, officer, or employee thereof may grant any loan or extend any other service of the institution on the prior condition, agreement, or understanding that the borrower contract for any of the following with any specific firm, agency, or person:

. . . . .

(3) Legal services, including title examination, and escrow and abstract services . . . .

But defendants respond with § 563.35(c):

(c) The prohibition contained in subparagraph (3) of paragraph (a) of this section shall not be construed to prohibit the insured institution from requiring the borrower to pay an initial loan charge to reimburse the institution for legal services rendered to it by an attorney selected by the institution in connection with the processing and closing of a loan.

The section has recently been amended, and now reads:

§ 563.35 Restrictions involving loan services.

(a) *Tie-in prohibitions.* No insured institution or service corporation affiliate thereof may grant any loan on the prior condition, agreement, or understanding that the borrower contract with any specific person or organization for the following:

. . . . .

(3) Legal services rendered to the borrower;

(c) *Limitation on paragraphs (a) and (b).* Notwithstanding paragraphs (a) and (b) of this section, an insured institution or subsidiary thereof may refuse to make any loan if it believes on reasonable grounds that the insurance services provided by the person or organization selected by the borrower will afford insufficient protection to such institution or subsidiary.

Significant is an entirely new subsection "d" providing:

(d) *Payment of attorney's fee by home borrowers.* In connection with a loan on a home (as defined in § 541.10–2 of this chapter) occupied or to be occupied by the borrower, an insured institution or subsidiary thereof may require such borrower to reimburse it for legal services rendered by its attorney, or to directly pay such attorney for such services, only if:

(1) such attorney's fee is limited to legal services attributable to processing and closing such loan (and not unrelated services performed for the institution or subsidiary by the attorney);

---

**28.** For example, the trial court acknowledged that competition for title certification might be interstate, but discounted this possibility because "plaintiffs have shown neither that this type of competition exists, nor, assuming it does, that its volume is greater than *de minimis.*" Appendix at 285a.

*See also Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Brett v. First Federal Savings & Loan Ass'n,* 461 F.2d 1155 (5th Cir. 1972). The district court relied on *Spens v. Citizens Federal Savings & Loan Ass'n,* 364 F.Supp. 1161

(N.D.Ill.1973), saying: *"Facts identical with those under discussion, i.e.,* an allegedly unlawful tie-in involving credit imposed by a single institution without market power, *compelled dismissal on jurisdictional grounds* of a claim under § 1 of the Sherman Act [in *Spens*]." Appendix at 290a (emphasis added). But in *Spens,* although the court dismissed under Fed. R.Civ.P. 12 without specifying any section of Rule 12, it is apparent that the dismissal was granted under Rule 12(b)(6). The court said plaintiffs had failed to state a cause of action because they had alleged neither a conspiracy nor, under *Fortner,* any market power.

(2) Such attorney's fee, if in excess of $100, is supported by a statement provided to the borrower at or prior to settlement which (i) describes the legal services being performed, (ii) sets forth the time being spent by such attorney and the hourly rate or other basis for determining such fee, (iii) states that the legal services are being performed on behalf of the insured institution or subsidiary and not on behalf of the borrower, and (iv) states that such services are being paid for by the borrower;

(3) Such attorney's fee does not exceed that which is reasonable and commensurate with the legal services being performed; and

(4) Such attorney's fee is separately itemized on the loan settlement sheet and identified as a fee to the lender's attorney.

(effective Sept. 30, 1976). Because plaintiffs request class action certification, allege continuing violations, and request injunctive relief, the amended regulation will also apply, as of its effective date.

The issue is whether the alleged tie-in is prohibited under § 563.35(a)(3) or authorized under § 563.35(c). This in turn depends on whether the legal services at issue are rendered to and for the bank, First Federal, or are rendered to and for the customer plaintiffs.

The parties are squarely at odds on this factual issue. That fact alone distinguishes this case from *Forrest, supra* note 12. In *Forrest,* the plaintiffs who challenged a practice similar to the one under consideration were attorneys, who claimed they were being unlawfully excluded from performing the mortgage-related legal services. There was no dispute about to whom the legal services were rendered: the parties stipulated that the legal services were performed for the benefit and sole interest of the lenders. Moreover, in *Forrest,* no issue was raised as to the applicability of any federal regulations.

In the case at hand, however, we have both a claim directly under the federal banking regulations, and antitrust claims involving the same conduct alleged to violate federal regulations. In such a case it is entirely appropriate to allow the federal agency responsible for those regulations to have the initial opportunity to characterize the conduct in question. *See United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); K. Davis, *Administrative Law of the Seventies* § 1901 (1976).

The same disposition applies to the Mortensens' second claim under the banking regulations, that First Federal has violated 12 C.F.R. § 571.7(b) by allowing defendant Johnstone to act as a director of First Federal while he is also a partner in the law firm to which the bank refers all its mortgage related work. That section provides:

§ 571.7 Conflicts of interest.

. . . . .

(b) Among the practices and conditions which have such adverse effects are conflicts between the accomplishment of the purposes of title IV set forth in paragraph (a) of this section and the personal financial interests of directors, officers, and other affiliated persons of insured institutions. Conflicts of this type which have demonstrably resulted in such adverse effects are considered by the Board to be inherently unsafe and unsound practices and conditions. The Board accordingly holds that each director, officer, or other affiliated person of an insured institution has a fundamental duty to avoid placing himself in a position which creates, or which leads to or could lead to, a conflict of interest or appearance of a conflict of interest having such adverse effects.

At oral argument a question was raised as to whether plaintiffs can maintain a private cause of action under 12 C.F.R. §§ 563.35(a), (c) and 571.7(b). *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Goldman v. First Federal Savings and Loan Association of Wilmette,* 518 F.2d 1247, 1250 n. 6 (7th Cir. 1975) (per Stevens, J.). Because this issue was neither raised in the district court nor

briefed on appeal, we leave this for determination by the district court on remand.

Appellants contend that even assuming their claims under the FHLBB regulations would normally fall within the primary jurisdiction of the FHLBB, we should make an exception here because those claims are integrally related to a federal antitrust claim. *See* K. Davis, *Administrative Law of the Seventies* § 19.06 (1976). Because the federal courts have been given exclusive jurisdiction of federal antitrust claims, the Mortensens argue, the federal court should not defer to administrative agencies on claims involving the same conduct attacked as violative of the antitrust laws.[29]

■ This argument misconstrues the nature of primary jurisdiction. That the appropriate administrative agency is given the first opportunity to categorize the factual issue here involved does not mean that its characterization will be binding on the federal court when it does consider the federal antitrust claim.[30] What primary jurisdiction does mean is that conflicts between federal antitrust law and an agency's regulations will not present themselves in the federal court until the agency has had a chance to state its interpretation of its own regulations.[31]

For that purpose, the district court on remand should consider staying the antitrust action in this suit until plaintiffs have obtained an interpretation from the FHLBB of the relevant regulations, in light of *Ricci v. Chicago Mercantile Exchange,*

409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). The *Ricci* Court affirmed a ruling that the district court must stay an antitrust suit, pending the Commodity Exchange Commission's determination. Three reasons were given: 1) the district court would have to determine whether the Commodity Exchange Act or any of its provisions are incompatible with the maintenance of an antitrust action; 2) some facets of the dispute were within the jurisdiction of the Commodity Exchange Commission; and 3) adjudication of that dispute by the agency promised to be of material aid in resolving the immunity question. *Id.* at 302, 93 S.Ct. 573.

### IV.

For the foregoing reasons, we 1) vacate the dismissal of plaintiffs' Sherman Act claim, 2) affirm the holding that the FHLBB claims are within the primary jurisdiction of that agency, and 3) remand with instructions to consider a stay of the antitrust action in light of *Ricci, supra.* An order to that effect will be entered.

---

**29.** Appellants rely on *California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1961), but in that case the FPC granted a merger application while the legality of that proposed merger was the subject of a Clayton Act § 7 suit in federal court. The holding was bottomed on the immense practical difficulties of unscrambling such a merger. Here there would be relatively simple changes at most.

**30.** Nor will it be binding in considering the regulation itself. An appeal from the agency would lie in our court, 12 U.S.C. § 1464(d)(7)(B), but assuming the FHLBB here were to rule that the conduct did amount to a tie prohibited by its regulations, Mortensens could then come back to the district court. In

that case, the fact that the agency prohibited the conduct, while not determinative on the antitrust issue, could be given appropriate weight by the district court in resolving the antitrust claim.

**31.** Congress has given the FHLBB the power to prescribe rules and regulations governing the organization and operation of federal savings and loan institutions. 12 U.S.C. § 1464(a). For procedures governing hearings before the FHLBB, *see* 12 U.S.C. § 1464(d). If the FHLBB declines to act, then plaintiffs may return to district court. *See Milberg v. Lawrence Cedarhurst Federal Savings & Loan,* 496 F.2d 523 (2d Cir. 1974).