Desiree CARONE–FERDINAND
et al., Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY
et al., Defendants.

No. CIV.A.00–403(RMU).

United States District Court,
District of Columbia.

Feb. 27, 2001.

Raymond D. Kohlman, Attleboro, MA, Desiree Carone–Ferdinand, Thomas E. Ferdinand, Corrales, NM, for Plaintiffs.

G. Michael Harvey, Assistant United States Attorney, Washington, DC, Robert R. Fuentes, Fuentes & Associates, P.C., Rio Rancho, NM, for Defendants.

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION TO DISMISS

URBINA, District Judge.

## I. INTRODUCTION

This case comes before the court on the defendants' motion to dismiss. The plaintiffs, Desiree Carone–Ferdinand and Thomas Ferdinand, seek $38 million from the Central Intelligence Agency ("CIA") and the United States Army (collectively the "Federal Defendants"), Robert Fuentes, Oliver North, and James Robert Strauss for alleged theft of insurance policies, bank accounts, and other property. The plaintiffs claim that the defendants knowingly diverted the personal property of Albert V. Carone, Desiree Carone–Ferdinand's father, for their own or other persons' use through, *inter alia*, fraud, larceny, and embezzlement. Specifically, the plaintiffs claim that the defendants took these steps to cover up Mr. Carone's

participation in government-sanctioned illegal activity. For the reasons that follow, the court holds that the plaintiffs' claims are fictitious. Thus, the court will dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II. BACKGROUND

The plaintiffs' allegations encompass events spanning the last 60 years, and involve organized crime families, two previous Directors of Central Intelligence ("DCI"), and three former United States Presidents. The plaintiffs claim that 10 years ago, the federal government killed Ms. Carone–Ferdinand's father and stole the property at issue in this lawsuit to cover up Mr. Carone's role in various government covert operations.

The plaintiffs paint a colorful portrait of Mr. Carone's past. According to the plaintiffs, Mr. Carone had a very diverse resume that included stints as, at various times, a "made" member of the Genovese Crime Family, a detective in the New York Police Department ("NYPD"), a Colonel in the U.S. Army Military Intelligence–Counter Intelligence Corps, and a CIA operative. See Compl. at 2–17.

As recounted in the complaint, the events leading up to the CIA's alleged misappropriation of the plaintiffs' property began during World War II. See id. At that time, a young go-getter and "charismatic patriot" named Albert Carone was working as an officer in the Office of Strategic Services (the predecessor to the CIA) when he was introduced to Mr. William Colby and Mr. William Casey, both of whom would go on to serve as DCI. See Decl. of William J. Casey ("Casey Decl.") at 1–2. Duly impressed with Mr. Carone's charisma and patriotism, as well as his dual status as a member of the Genovese Crime family and an NYPD detective, the CIA allegedly recruited Mr. Carone to act as a liaison between the CIA and "certain Chinese and Italian businessmen in New York City." See Decl. of Albert V. Carone ("Carone Decl.") at 1.

The plaintiffs claim that for the next 40–odd years, Mr. Carone helped import cocaine into the United States on direct orders from the CIA. The profits from the cocaine sales were then laundered through organized crime operations, and were ultimately funneled to CIA-sanctioned, covert, anti-communist activities. One of the largest shipments that Mr. Carone allegedly facilitated was the importation of more than one million pounds of cocaine between 1976 and 1981. See Casey Decl. at 1–2. This cocaine was allegedly brought into the United States by way of Mena, Arkansas, population 5,475. See Casey Decl. at 2. Though one might think that the importation of more than $40 billion worth of cocaine into one municipal airport over a five-year period would arouse suspicion, law enforcement was kept at bay through the efforts of one William Jefferson Clinton. See Casey Decl. at 2. At the time in question, Mr. Clinton was the Attorney General of the State of Arkansas.

The complaint also indicates that Mr. Carone's duties were not only limited to drug trafficking. In one memorable assignment, Mr. Carone was ordered to assassinate President John F. Kennedy. See Supp. Aff. of Thomas E. Ferdinand ("Ferdinand Supp. Aff.") at 2. While Mr. Carone managed to situate himself on the roof of the "Dallas Airport," he was unable to complete his mission because other people accompanying the president were standing in the line of fire. See id.

According to the plaintiffs, Mr. Carone's affiliation with the CIA ended in 1985. See Decl. of Desiree Ferdinand ("Decl.D.Ferdinand") at 2. During a two-week trip to Chapatulla, Mexico with defendant Strauss, Mr. Carone "destroyed an entire village of men, women and children." See id. Apparently, after this incident (about which the plaintiffs offer no proof), Mr. Carone had a change of heart, and decided that he would no longer assist the CIA in its assassinations and drug

trafficking. *See id.* The plaintiffs believe that as a result, the CIA or people affiliated with the CIA poisoned Mr. Carone, leading to his death in 1990.

After Mr. Carone's death, Ms. Carone–Ferdinand was named executrix of Mr. Carone's estate. *See Compl.* at 2. The plaintiffs claim that they transmitted several life insurance policies, proof of joint ownership of several bank accounts, proceeds from the sale of a coin collection, and access to several storage units containing Mr. Carone's personal property to defendant Robert Fuentes, an attorney operating out of Rio Rancho, New Mexico. *See Compl.* at 14. According to the plaintiffs, shortly after they transferred the property to Mr. Fuentes, defendant James Robert Strauss, on orders from the CIA, approached defendant Fuentes, who then surrendered Mr. Carone's estate in exchange for a monetary reward. *See id.*

The plaintiffs claim that in 1996 they located a William M. Tyree, who verified much of Mr. Carone's story. *See* Ferdinand Supp. Aff. at 2. Additionally, after further inquiry, the plaintiffs allege that they were able to determine that the named defendants stole Mr. Carone's estate to cover up his role in the Iran–Contra affair and other classified operations. *See Compl.* at 16.

On February 29, 2000, the plaintiffs filed a six-count complaint alleging, *inter alia,* larceny, conversion of Mr. Carone's estate, and constitutional violations. The complaint also stated a claim of negligence against defendant Fuentes.

The defendants attack the complaint on a wide array of substantive and procedural grounds. The defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, under Rule 9(b) for failing to aver fraud with particularity, and under Rule 8(a) for failure to contain a short and plain statement of jurisdiction. In addition, the federal defendants argue that the plaintiffs' tort claims are barred by various provisions of the Federal Tort Claims Act, sovereign immunity, failure to exhaust administrative remedies, and applicable statutes of limitations. All defendants seek, in the alternative, a transfer to the United States District Court for the District of New Mexico.

For the reasons that follow, the court will grant the defendants' motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

## III. ANALYSIS

### A. Legal Standard

It is well-settled law that "the federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial [sic] as to be absolutely devoid of merit.'" *Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (quoting *Newburyport Water Co. v. Newburyport,* 193 U.S. 561, 579, 24 S.Ct. 553, 48 L.Ed. 795 (1904)). This Circuit has stated that dismissal under 12(b)(1) is appropriate "when the complaint is 'patently insubstantial' presenting no federal question suitable for decision." *Best v. Kelly,* 39 F.3d 328, 330 (D.C.Cir.1994) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 n. 6, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)); *accord O'Brien v. United States Dep't of Justice,* 927 F.Supp. 382, 384 (D.Ariz. 1995); *Shoemaker v. United States,* 1997 WL 96543, *5 (S.D.N.Y.1997); *O'Connor v. United States,* 159 F.R.D. 22, 25 (D.Md. 1994). The D.C. Circuit explained that for claims to be considered patently insubstantial, they cannot merely be doubtful or questionable, but rather they have to be "essentially fictitious." *See Best,* 39 F.3d at 330. Examples of essentially fictitious claims are "bizarre conspiracy theories," "fantastic government manipulations of [one's] will or mind," and "any sort of supernatural intervention." *See id.*

## B. The Court Will Dismiss the Complaint Pursuant to Rule 12(b)(1)

Under the factors laid out by the Supreme Court and the D.C. Circuit, the complaint cannot survive the defendants' motion to dismiss under Rule 12(b)(1). Consequently, the court need not address the alternate defenses raised by the defendants. To support the allegations in their complaint, the plaintiffs have presented affidavits from Mr. Albert Carone, Mr. William Tyree, Mrs. Desiree Carone–Ferdinand, Mr. Thomas Ferdinand, Mr. William Casey, and a book excerpt that appears to be based largely upon declarations similar to those in Mrs. Carone–Ferdinand's affidavit.

■ When facts that form the basis of subject-matter jurisdiction are in controversy, a district court has authority to weigh the conflicting evidence to determine if subject-matter jurisdiction exists. *See Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990); *accord Williamson v. Tucker,* 645 F.2d 404, 412–13 (5th Cir.1981); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). After examining the plaintiffs' evidence in this case, the court finds that the plaintiffs' claims are "essentially fictitious." Thus, the court lacks subject-matter jurisdiction over the controversy.

■ On its face, the complaint appears to be the very type of "bizarre conspiracy theory" that the D.C. Circuit has said warrants dismissal under Rule 12(b)(1). For example, the declaration of former Director of Central Intelligence William Casey is so obviously false as to cast doubt on the plaintiffs' entire case. As the federal defendants aptly stated:

> Plaintiffs' submission of an alleged declaration of now-deceased CIA Director William Casey—*supposedly witnessed by a former President*—only further verifies the fictitiousness of plaintiffs' claims. This document's frequent misspellings, absence of grammar, bizarre free-association, and flippant admission of criminal activity by high-ranking government officials, including Mr. Casey himself, establishes its own falsity and the patent absurdity of plaintiffs' claims.

Federal Defendants' Motion to Dismiss or in the Alternative for Transfer ("Fed. Defs.' Mot.") at 10–11 (emphasis in the original).

In addition, the defendants have also submitted declarations from former CIA General Counsel David P. Doherty, who served as General Counsel at the time Director Casey allegedly made the declaration, and from the current Information Review Officer for the Director of Central Intelligence Area, Ms. Martha M. Lutz. Mr. Doherty stated that he had no recollection of the alleged Casey declaration, and that:

> In the ordinary course of business during my tenure as CIA General Counsel, any official declaration by DCI Casey would have been prepared by the CIA's Office of General Counsel. A declaration by DCI Casey of this apparent significance and national security sensitivity—in which, on its face anyway, he freely acknowledges violations of law—should necessarily have come to my attention as the senior attorney in the Agency at that time ... Moreover, I have no recollection of Richard Nixon—in this context, presumably the former U.S. President—ever serving as a witness to any official declaration made by DCI Casey during my tenure as CIA General Counsel. I am confident that I would recall such a notable and memorable event had it ever occurred.

Decl. of David P. Doherty ("Doherty Decl.") at 2–3. In her declaration, Ms. Lutz stated that after conducting a thorough search of the CIA's records, she found no such declaration from Director Casey, and that if the Casey Declaration were genuine, it almost certainly would have been located during the search. *See*

Decl. of Martha M. Lutz ("Lutz Decl.") at 4.

According to their declarations, the plaintiffs would have this court believe that Mr. Carone has played the role of Forrest Gump, popping up as a key player in virtually every prominent government conspiracy theory promulgated over the past 50 years. This court simply cannot view any of the plaintiffs' claims as plausible, especially in light of the complete lack of even a scintilla of evidence except for one patently forged document and self-serving declarations. While the complaint may be worth entering in a creative writing contest, it was not worth entering in a court of law. Accordingly, the court dismisses the case pursuant to Rule 12(b)(1).

## IV. CONCLUSION

For all of these reasons, the court grants the defendants' motion to dismiss. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 27 day of February, 2001.