Nicole **LINDSLEY,** a minor, through her parent and legal guardian, Theresa **KOLODZIEJCZACK,** Plaintiff,

v.

The **GIRARD SCHOOL DISTRICT;** the **Board of Directors for the Girard School District; Robert Snyder,** personally and in his official capacity as a Principal for the Girard School District; **Greg McClelland,** personally and in his official capacity as an Assistant Principal for the Girard School District, and **Gayla DeMarco,** personally and in her official capacity as a Guidance Counselor for the Girard School District, Defendants.

Civil Action No. 01–180 Erie.

United States District Court,
W.D. Pennsylvania.

Aug. 1, 2002.

---

David C. Long, Olivesburg, PA, Michael L. Rosenfield, Pittsburgh, PA, for Plaintiff.

Patricia K. Smith, Esq., Knox, McLaughlin, Gornall & Sennett, Erie, PA, for Defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff, Nicole Lindsley, through her parent and legal guardian, Theresa Kolodziejczack, (hereinafter "Plaintiff") seeks in this action declaratory relief and compensatory and punitive damages for alleged violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et. seq., as amended by* Pub.L. 105–17 at § 615(I)(3)(A) 1997; the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101. The Defendants are the public school district where Plaintiff formerly attended school and various administrators and officials of this district. Presently before this Court are Defendants' Motion to Dismiss [Doc. No. 3] and Plaintiff's Motion to Amend the Complaint to Delete Requested Forms of Relief [Doc. No. 6]. In the latter motion, Plaintiff seeks to amend the Complaint to request only compensatory and punitive damages. For the reasons set forth below, we will grant the Defendants' motion and deny the Plaintiff's.

### I. BACKGROUND

Plaintiff first attended Rice Avenue Middle School, a public school within the Girard School District, as a sixth-grade stu-

dent in the 1999–2000 school year. Cmplt. ¶ 30. Her sixth-grade year was primarily without incident, and in late August 2000, she began the seventh grade at the same school. Cmplt. ¶ 30. In this year, Plaintiff wore some article of clothing bearing a religious declaration "virtually every day." Cmplt. ¶ 33. The Complaint is silent as to whether she wore similar clothing during her sixth-grade year. Natasha, a friend of Plaintiff's who also attended Rice Avenue Middle School, dressed similarly. Examples of the pictures and declarations on the students' clothing include:

a. A rendition of Jesus carrying a cross with the words "The Sin of the World" inscribed on the cross. The message on the shirt states "Lord's Gym. Bench Press This!"

b. "U Must Be Born Again. Jesus Saves. John 3:3."

c. "Get a Life. Follow Jesus."

d. "Sing Unto the Lord."

e. "Rejoice. Jesus Christ. He's the Real King."

f. A rendition of a young man holding a lamb, with the message "I have a Good Shepherd."

g. "Our God is an Awesome God."

h. A rendition of a hand bloodied by a large spike, with the message "His Pain Our Gain."

i. "There is Only One Way. He's Jesus."

j. "Christ our Savior Sanctifier, Healer and Coming King."

k. "Praise the Lord."

l. "Soldiers of Christ."

m. W.W.J.D. [What Would Jesus Do?]

n. "With God All Things Are Possible."

Cmplt. ¶ 33. Plaintiff alleges that other students harassed her verbally and physically on an almost daily basis. Cmplt. ¶ 34. She was repeatedly called names such as "Jesus Freak," "God Praiser," "Jesus Lover," "bitch," and "whore." Students said things such as "God is never coming back. We hate God" and "I'm Jesus, you have to worship me now." A female student threatened to stab Plaintiff and on another occasion, a male student twisted her arm. Two boys doused Plaintiff with cologne and threatened to light her on fire while she was walking home from her bus stop. In one class, students left notes stating that "Jesus Sucks," "Nicole Sucks," and Natasha "does her mother." Cmplt. ¶¶ 34–35. Plaintiff's house and her mother's car were pelted with eggs and their telephone and cable lines were cut. Cmplt. ¶ 36. When Plaintiff and Natasha objected to a Reading class assignment on the subject of witches, the teacher stated in front of the class, "[i]f you don't want to do this kind of work, you should go to another school." Cmplt. ¶ 35.

It is alleged that both Plaintiff and Natasha complained to defendants Snyder and McClelland, the Principal and Vice-Principal of the school, respectively, on numerous occasions. Cmplt. ¶ 37. In response, these defendants generally indicated that they would investigate the complaints but did not effectively discipline any of the students. Snyder and McClelland often indicated that the problems were the girls' own fault and on one occasion McClelland said to Plaintiff, "[w]e all know you are a Christian. You don't have to wear those clothes everyday." Cmplt. ¶ 37. Allegedly to discourage Plaintiff and Natasha from making more complaints, these defendants told them that if they punished the students who were the subject of the complaints, they would have to punish the girls as well. Cmplt. ¶ 37. Plaintiff's mother also made frequent complaints to the Principal and Vice-Principal to no avail; after one complaint McClelland told her that, "[y]our daughter is asking for trouble, wearing those shirts." Cmplt. ¶¶ 39–40.

Plaintiff alleges that as a result of the students' conduct, it became difficult for her to concentrate and focus on her schoolwork and consequently, that her grades declined substantially in her seventh grade year. Cmplt. ¶ 41. She also had nightmares about being stabbed, was afraid to attend school and missed 21 days in the first three grading periods. Cmplt. ¶ 36. At the end of the first quarter, Nicole received failing grades in Science, English and World Cultures and defendant De-Marco, a guidance counselor at the school, sent a letter to Plaintiff's mother informing her that Plaintiff was in academic danger for the school year. Cmplt. ¶ 41. De-Marco sent a similar letter after Plaintiff received failing grades in Science, Reading and English in the second quarter. In the third quarter, Plaintiff received failing grades English and Mathematics, and incomplete marks in Science and World Cultures. Cmplt. ¶¶ 41–42. No district official ever requested permission to evaluate Plaintiff. Cmplt. ¶ 6. In order to lessen Plaintiff's contact with some of the worst students, Defendants changed her class schedule. Cmplt. ¶ 37. On March 31, 2001, Plaintiff transferred to Girard Alliance Christian Academy.

Plaintiff contends that the Defendants' have violated her federal constitutional rights to equal protection, substantive due process and freedom of speech. She also contends that they have violated her rights under IDEA, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the basis that Plaintiff has failed to state any claim. Plaintiff opposes this motion and has also filed a motion to amend her complaint to delete her request for declaratory relief.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) may present either a facial or a factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). A motion which makes a facial challenge to a complaint requires that the court consider the allegations of the complaint as true and make all reasonable inferences in plaintiff's favor. *Id.* In the case of a factual challenge to the complaint, the court is free to consider and weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to "satisfy itself as to the existence of its power to hear the case." *Id.* Consequently, the plaintiff must present "affidavits or other competent evidence that jurisdiction is proper." *Dayhoff, Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir.1996), *cert. denied,* 519 U.S. 1028, 117 S.Ct. 583, 136 L.Ed.2d 513 (1996). In this instance, Defendants do not rely on extrinsic evidence outside the pleadings and accordingly, we must consider the allegations in the Complaint as true and draw all reasonable inferences in Plaintiff's favor. *Mortensen,* 549 F.2d at 891.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the district court must accept as true all well-pleaded allegations, and must view the facts and inferences to be drawn from the pleadings in the light most favorable to the nonmoving party. *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 406 (3d Cir.1993) (citation omitted). The proper inquiry is "whether relief could be granted ... 'under any set of facts that could be proved consistent with the allegations.'" *Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 71 (3d Cir.1994) (*quoting National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)). Judgment will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to

judgment as a matter of law. *Regalbuto v. City of Philadelphia*, 937 F.Supp. 374, 377 (E.D.Pa.1995), *aff'd*, 91 F.3d 125 (3d Cir. 1996), *cert. denied*, 519 U.S. 982, 117 S.Ct. 435, 136 L.Ed.2d 333 (1996) (*citing Inst. for Scientific Info., Inc. v. Gordon and Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir.1991), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991)).

▪ The Federal Rules of Civil Procedure provide that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Although the decision to grant or deny leave to amend a complaint is committed to the sound discretion of the district court, leave should, consistent with the command of Rule 15(a), be liberally granted. *Gay v. Petsock*, 917 F.2d 768, 772 (3d Cir.1990); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 518–19 (3d Cir.1988). The United States Supreme Court has articulated the following standard to be applied in evaluating whether to grant or deny leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 183, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

### III. Discussion

*A. Claims for Violations of Equal Protection, Substantive Due Process and Freedom of Speech Pursuant to 42 U.S.C. § 1983 (Claims I, II and III)*

▪ Section 1983 does not itself create substantive rights or impose obligations on government officials. Rather, the statute provides a cause of action by which persons may seek relief for governmental violations of the United States Constitution or federal law. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In Counts I, II, and III, Plaintiff alleges that the Defendants' conduct relating to the harassment she allegedly endured at the hands of other students violated her federal constitutional rights to substantive due process, equal protection and freedom of speech. We will consider Plaintiff's substantive due process claim first.

▪ In *Davis v. Monroe*, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the United States Supreme Court held that the recipients of federal educational funds may be held liable for violations of Title IX, 20 U.S.C. § 1681(a), pursuant to § 1983 if they are deliberately indifferent to known acts of student-on-student sexual harassment. Title IX provides that:

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Under *Davis*, liability only attaches in instances where the recipient's response or lack thereof is "clearly unreasonable in light of the known circumstances" and the harassment itself is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 648, 650, 119 S.Ct. 1661. The Court also stated that liability would not attach on the basis of "simple acts of teasing and name-calling among school children," and provided the following examples: (1) an overweight child who skips gym class because she is teased about her

weight; (2) a child who refuses to wear glasses because other students call her "four-eyes;" and (3) a child who refuses to go to school because a bully calls her "scaredy-cat" at recess. *Id.* at 652, 119 S.Ct. 1661.

Subsequent to *Davis,* the Court of Appeals for the Third Circuit observed in a footnote that its rationale would apply equally to harassment "on the basis of the personal characteristics enumerated in Title VI and other relevant federal anti-discrimination statutes." *Saxe v. State College Area School District,* 240 F.3d 200, 206 n. 5 (3d Cir.2001). We are not aware of any case law, however, that has extended *Davis* to create a claim under the Due Process Clause of the Fourteenth Amendment and we decline to do so here. Primarily, it is inherently unsound to assume that the Court's rationale in *Davis,* a Title IX case, can be applied in the context of a federal constitutional due process claim. Moreover, the extension of *Davis* in the due process context is very problematic in light of *DeShaney v. Winnebago County Dept. Of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and its progeny.

In *DeShaney,* the United States Supreme Court held that absent a special relationship between a state and an individual in which the state affirmatively restrains the individual's liberty, such as the state's relationship to a prisoner, the Due Process Clause does not obligate states to protect individuals from acts of private violence. *Id.* at 195–198, 109 S.Ct. 998. Subsequent to *DeShaney,* the Court of Appeals for the Third Circuit held that compulsory school attendance paired with *in loco parentis* authority during the school day does not trigger an obligation on the part of schools to protect students from private harm. *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354

(1993) (school had no obligation under the Due Process Clause to protect students from sexual assault by other students that occurred on school property and during school hours). The Court began its analysis by noting that in general, the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens but rather serves as a limitation on the state's ability to act. *Id.* at 1368. In contrast to the relationship between the state and prisoners, which is an exception to the general rule in which an affirmative obligation to protect does exist, the Court observed that:

> [b]y requiring D.R. to attend assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs. Thus, the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney,* particularly when their channels for outside communication were not totally closed. The analogy between school children and prisoners or the involuntarily committed is weakened further by the fact that school children remain resident in their homes. Thus, they may turn to persons unrelated to the state for help on a daily basis.

*Id.* at 1372 (internal citations omitted). Thus, even if we assume that the students' conduct of which Plaintiff complains and which took place on school premises was sufficiently severe to infringe Plaintiff's liberty interest for purposes of due process analysis, an issue we do not decide, the Defendants' failure to protect her from that conduct is not constitutionally actionable.

In *Castaldo v. Stone*, 192 F.Supp.2d 1124, 1154–1155 (D.Colo.2001), the parents of a slain high school student alleged, among other things, that the defendants violated their son's right to substantive due process by failing to protect him from the private harm that caused his death. Similar to the Third Circuit, the Tenth Circuit held following *DeShaney* that schools owe no duty under the Due Process Clause to protect students from assaults by other students, even when they know or have reason to know of the danger. *Graham v. Independent School Dist. No. I–89*, 22 F.3d 991, 994–995 (10th Cir. 1994). In *Castaldo*, the district court rejected the argument that *DeShaney's* application to schools should be reevaluated in light of *Davis*:

> [t]he decisions in *Davis* and *Murrell* do not address the appropriate inquiry of duty under the Fourteenth Amendment. *Davis* and *Murrell* address liability pursuant to Title IX, which proscribes discrimination on the basis of gender. Plaintiffs argue that *DeShaney's* application to schools must be reassessed in light of the Supreme Court's interpretation of Title IX of the Education Amendments of 1972. The notion that the elements of a Title IX claim are transferable to a Due Process Claim impermissibly presumes that a statute can amend the U.S. Constitution.

*Id.* at 1154 (internal citations omitted).

We fundamentally agree with *Castaldo*. In *Davis*, the Court stated that Title IX has "long provided funding recipients with notice that they may be liable for their failure to respond to discriminatory acts of certain non-agents." *Davis*, 526 U.S. at 643, 119 S.Ct. 1661. The decision solely addresses Title IX and does not pertain to the obligations of schools under the Due Process Clause. Because, as previously discussed, the relationship between the Defendants and Plaintiff does not give rise to a special relationship in which she is owed a duty of protection under controlling authority, she may not maintain a due process claim under this theory. *See generally D.R.*, 972 F.2d 1364.

Quite apart from a due process claim predicated on a special relationship between the state and a specific individual, state defendants may be held liable for the deliberate and reckless establishment and maintenance of a custom, practice or policy that causes harm to a student. *D.R.*, 972 F.2d at 1376 (*citing Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990)). Plaintiff cannot maintain a due process claim under this theory either, however, because again assuming that the underlying complained-of conduct is sufficiently severe to be actionable for due process purposes, it was committed by private actors. *See id.* (linchpin of due process claim for custom, practice or policy theory is an underlying constitutional violation by state actors).

■ We also find that Plaintiff has failed to state claims in Counts I and III of her Complaint, which respectively allege violations of her federal constitutional rights to equal protection and freedom of speech. With respect to the former, it is fundamental that in order to maintain an equal protection claim, a plaintiff must allege that he or she received different treatment from other similarly situated individuals or groups. *Brown v. Borough of Mahaffey*, 35 F.3d 846, 850 (3d Cir.1994) (*citing City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Here, Plaintiff has not alleged that any similarly situated student was treated differently by the Defendants.

■ With respect to the latter, the nature of Plaintiff's freedom of speech theory is not entirely clear from the face of the Complaint. She does not allege that any

defendant ever affirmatively prevented her from wearing clothes with religious messages. As far as we can ascertain, Plaintiff means to assert that the Defendants' allegedly inadequate responses to her complaints discouraged her from wearing these clothes and thereby had a chilling effect on her freedom of expression. Her claim, however, concerns a discrete period in the past and her Complaint fails to allege that her expression was in fact chilled. *See Aiello v. City of Wilmington,* 623 F.2d 845, 857 (3d Cir.1980) (when claim for unconstitutional chilling effect concerns a discrete period in the past, it is reasonable to consider whether the plaintiff's conduct is consistent with the claim). In this regard, Plaintiff alleges that virtually every day she attended Rice Avenue Middle School, she wore some article of clothing bearing a religious declaration. Cmplt. ¶ 33. In short, Plaintiff does not allege that the school required her to cease her First Amendment expression, nor does she allege that she voluntarily ceased the expression in response to the acts of alleged harassment. Otherwise stated, as in *Aiello,* the Plaintiff's claim that her freedom of expression was chilled is inconsistent with her own conduct as alleged in the Complaint. Accordingly, we will dismiss Counts I, II, and III of the Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

### B. IDEA, Rehabilitation Act and ADA Claims Pursuant to 42 U.S.C. § 1983 (Counts IV, V, and VI)

Under IDEA, states that implement policies that ensure a "free appropriate public education" for all of their disabled children are entitled to federal funds. 20 U.S.C. § 1412(1). The Act defines "children with disabilities" as not only those traditionally recognized as handicapped, such as those children with mental retardation, hearing impairments, speech or language impair-

ments and visual impairments, but also those with "serious emotional disturbance ... who by reason thereof, need special education and related services." 20 U.S.C. § 1401(3)(A). An "emotional disturbance" is a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree explained by intellectual, sensory, or health factors; (2) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (3) inappropriate types of behavior or feelings under normal circumstances; (4) a general pervasive mood of unhappiness or depression; and/or (5) a tendency to develop physical symptoms or fears associated with personal or school problems. 34 C.F.R. § 300.7(c)(4)(I). Among the conditions recipient states must satisfy under IDEA is the requirement that it demonstrate that "all children residing in the State who are disabled, regardless of the severity of the disability, and who are in need of special education and related services are identified, located, and evaluated." 20 U.S.C. § 1414(a)(1)(A); *W.B. v. Matula,* 67 F.3d 484, 492 (3d Cir.1995). This is commonly referred to as the "child find" duty. *Id.* at 492. The Rehabilitation Act imposes a similar duty on states to provide a free, appropriate public education. 29 U.S.C. § 794(a); *see also Matula,* 67 F.3d at 492–493 (observing that there are few differences between the obligations of IDEA and the Rehabilitation Act in this regard, although the former is phrased as an affirmative duty and the latter is phrased as a negative prohibition).

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). Under the ADA, "no qualified individual

with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The two statutes have virtually synonymous definitions of disability. Under the Rehabilitation Act, a "disabled individual" is one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 U.S.C. § 705(20)(B)(I). The ADA defines disability as a "physical or mental impairment that substantially limits one or more of the major life activities of such an individual." 42 U.S.C. § 12102(2)(A). "Learning" is a major life activity. 34 C.F.R. § 104.3(j)(2)(ii).

■ To establish a violation of the Rehabilitation Act, Plaintiff must establish that: (1) she was disabled as defined by the Act; (2) she was otherwise qualified to participate in school activities; (3) the school or board of education received federal financial assistance; and (4) she was excluded from participation in, denied benefits of, or subject to discrimination at, the school. *Matula,* 67 F.3d at 492 (*citing Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991)). In *Jeremy H. v. Mount Lebanon School Dist.,* 95 F.3d 272, 279 (3d Cir.1996), the Court of Appeals for the Third Circuit held that 42 U.S.C. § 12132 (a provision of the ADA) extended the nondiscrimination rule

of the Rehabilitation Act to entities that do not receive federal funds. Accordingly, Plaintiff's claims under the two statutes are equivalent.

One basis upon which Defendants urge us to dismiss Plaintiff's IDEA and Rehabilitation Act claims brought pursuant to 42 U.S.C. § 1983 is jurisdictional, and accordingly, we will address it first. Defendants contend that this Court lacks jurisdiction to hear these claims because Plaintiff has failed to exhaust her administrative remedies pursuant to 20 U.S.C. § 1415(*l*). This section states that:

> [n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*], Title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*); *see also W.B. v. Matula,* 67 F.3d 484, 495 (3d Cir.1995). Subsections (f) and (g) of the statute set forth the administrative procedures in detail that states must make available.[1]

---

1. Subsection (f) requires that recipient states provide an impartial due process hearing whenever a complaint is received under subsections (b)(6) or (k) of § 1415. Subsection (b)(6), the relevant subsection for purposes of this action, requires that parents be given:

> an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child
> . . .

Subsection (g) requires that any party aggrieved by the findings of the above-mentioned due process hearing be afforded the right to appeal. Pennsylvania's regulations incorporating these requirements are set forth in some detail in Chapter 14 of Volume 22 of the Pennsylvania Administrative Code, which is entitled Special Education Services and Programs Procedural Safeguards. 22 Pa. Code § 14.

In *Matula*, the Court of Appeals for the Third Circuit held that monetary damages are recoverable for IDEA claims brought pursuant to § 1983 and also elaborated on the circumstances under which IDEA's exhaustion requirement would be excused due to futility. *Matula*, 67 F.3d at 495–496. The Court preliminarily rejected the notion that exhaustion could be circumvented simply by "casting an IDEA claim as a § 1983 action predicated on IDEA." *ID.* At 495. In order for us to resolve the present jurisdictional dispute, it is necessary that we review *Matula* in some detail.

In the case, W.B., the mother of Mansfield Township Elementary School student E.J., met with the principal of the school before her son began the first grade there in the fall of 1991. *Id.* at 488. At the meeting, W.B. raised her concerns about E.J.'s behavior problems, such as touching and hitting, and she also completed forms indicating that E.J. had received speech therapy. Within the first few weeks of school, E.J.'s teacher informed W.B. that the boy might have Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder ("ADHD"). *Id.* The teacher also reported in the beginning of the school year that E.J. exhibited numerous disruptive behaviors, had difficulty beginning and completing tasks, coloring within lines, and using the bathroom properly. *Id.* In October, W.B. met with the teacher and the school official responsible for compliance with IDEA and the Rehabilitation Act, but neither mentioned an evaluation or the possibility that E.J. would be entitled to special services. *Id.* E.J. began seeing a private therapist who diagnosed him with ADHD sometime in the fall. After her son was diagnosed, W.B. requested that the school refer him to the school's child study team for an evaluation and the school refused. In February of 1992, the school finally relented and the team determined that E.J. had ADHD and was eligible for Rehabilitation Act services but not for IDEA services because he was performing at or above his grade level. *Id.* at 489. The school nonetheless failed to provide Rehabilitation Act services and W.B. then instituted her first administrative proceeding and requested an independent evaluation of her son. The School Board agreed to her request and the evaluation revealed that, in addition to ADHD, E.J. also suffered from Tourette's syndrome and a severe form of obsessive-compulsive disorder. *Id.*

In the beginning of his second-grade year, the school still was not providing E.J. with any special services and in November, 1992, the school's committee determined that he was perceptually but not neurologically impaired, meaning that he was entitled to a respectively lower level of IDEA services. *Id.* W.B. filed a petition to have her son classified as neurologically impaired and the school cross-petitioned to have him classified as perceptually impaired. After almost ten days of administrative hearings, a settlement was reached in which E.J. would be classified as neurologically impaired, an extensive Individualized Education Program ("IEP") would be implemented, and the school would pay $14,000 in attorneys' fees and costs. *Id.* at 490. After even further administrative hearings spanning about 17 days, an Administrative Law Judge ordered the School Board to place E.J. in a private school at its expense, to pay prospectively for his private therapy sessions, to reimburse W.B. for the cost of the independent learning disability evaluation it had refused to provide, and to provide a supplemental occupational therapy evaluation. *Id.* W.B. then commenced the civil action in which she sought compensatory and punitive damages. The district court held that the settlement of the administrative proceeding barred W.B.'s claims for damages. The Third Circuit reversed on this point and held that monetary damages were available to redress IDEA violations

brought pursuant to § 1983, and also that under the circumstances, exhaustion would have been futile. *Id.* at 495–496. On the latter point, the court observed that:

> [i]n the matter before us, it would be futile, perhaps even impossible, for plaintiffs to exhaust their administrative remedies because the relief sought by plaintiffs in this action was unavailable in IDEA administrative proceedings. We have some reservations about whether the administrative tribunal would even be competent to hear plaintiff's IDEA claim since any rights that can be had have already been settled, and both parties are required to adhere to the settlement agreement.

*Id.* at 496. The Court went on to say that:

> [w]e note that a second rationale for excusing exhaustion, identified in *Lester H.*, is also present here. In *Lester H.*, we pointed out that IDEA mandates resort in the first instance to administrative hearings so as to develop the factual record and resolve evidentiary disputes concerning, for example, evaluation, classification, and placement. Here, E.J.'s classification and placement have been resolved in the numerous proceedings before ALJ McGill. The factual record has been developed and an action seeking compensation for the alleged IDEA violations is now ripe for judicial resolution.

*Id.* (internal citations omitted).

Subsequent to *Matula*, we excused exhaustion in *Ronald D. v. Titusville Area School District*, 159 F.Supp.2d 857, 862 (W.D.Pa.2001) in large measure because the child's educational issues with the defendant district had been resolved. Prior to commencing the action, Ronald and Diane D., the parents of Timothy D., requested that the defendant conduct an evaluation of their son to determine his eligibility for special education and related services. *Id.* at 860. The district performed the evaluation and concluded in a Comprehensive Evaluation Report ("CER") that Timothy had wilfully chosen to be academically unsuccessful, and after two meetings with the plaintiffs at which the CER results were discussed, it recommended that Timothy be placed in regular education with no special aids or services. *Id.* Shortly thereafter, the plaintiffs and the defendant agreed to transfer Timothy to another, mutually acceptable public school where he remained for approximately one year before quitting due to emotional problems. *Id.* at 860, 862 n. 4. As in *Matula*, the Plaintiff in *Ronald D.* sought only compensatory and punitive damages.

■ Here, Plaintiff contends that *Matula* and *Ronald D.* stand for the proposition that, under IDEA, the futility exception to exhaustion is satisfied whenever a plaintiff requests relief that an administrative tribunal cannot provide, *i.e.*, monetary damages, regardless of the factual backdrop against which that request is made. We do not find that *Matula* stands for such a broad proposition. Nor was it our intention that *Ronald D.* would be read so broadly either.[2]

2. In Ronald D., in contrast to the instant case, there was at least an initial utilization of the administrative process. The plaintiffs requested that the district evaluate Timothy to determine whether he was entitled to special education and related services and the district issued a Notice of Recommended Assignment ("NORA") suggesting that Timothy attend a regular education program with no supplementary services. Shortly thereafter, the parties agreed to transfer Timothy to another school. Upon further reflection, we are of the opinion that the voluntary resolution of a dispute concerning the education of a disabled or allegedly disabled child does not excuse exhaustion *unless* the parties stipulate on the evaluation, classification and placement of the child or utilize the available administrative procedures to develop these factual issues prior to settlement. See *Lester H. v. Gilhool*, 916

■ *Matula,* like the instant case, involved the "child find" duty. Unlike the instant case, however, when the plaintiff in *Matula* believed that her son had not been found, she pursued the available administrative procedures in order that he could be evaluated, rendered eligible under IDEA, and ultimately provided with special education and related services appropriate for him.[3] Indeed, prior to commencing her action, W.B. had obtained an administrative determination that her child was a child with a disability entitled to IDEA services and an agreement under which the school would provide him with services pursuant to a complex IEP. Here, however, we are without an administrative determination on even the fundamental issue of *eligibility.* Thus, this case is materially distinguishable from *Matula* in at least one regard because, as Judge Caputo has observed, "one of the principal reasons for the exhaustion requirement—to allow the administrative body with the relevant expertise to create an evidentiary record prior to judicial review" did not apply in

*Matula* because the administrative body had already performed this function. *Falzett v. Pocono Mountain School District,* 150 F.Supp.2d 699, 703 (M.D.Pa.2001). Here, not only are we without an evidentiary record, we are without an administrative determination on the most fundamental question presented by a child find claim; whether Plaintiff was a child with a disability within the meaning of the Act. Notwithstanding this deficiency, Plaintiff suggests that it would be appropriate for us to pass in the first instance on the issue of whether she was disabled within the meaning of IDEA. We decline this invitation.

Under the IDEA procedural scheme, aggrieved parties first present their complaints to administrative bodies that have expertise in the area of educating disabled children; upon exhaustion of the administrative procedures, they are entitled to bring their complaints to a court of competent jurisdiction for review.[4] The Act does not envision courts as the factfinders in the first instance and provides the due

F.2d 865, 869–870 (3d Cir.1990) (in claim for 2 1/2 years of compensatory education, exhaustion was futile when parties stipulated in settlement that profoundly retarded child's in-home IEP was inappropriate, was designed to be temporary and school nonetheless took approximately 2 1/2 years to locate an appropriate program for the child); see also *Matula,* 67 F.3d at 495 (where child's classification and placement had been resolved in numerous proceedings before an ALJ prior to settlement, factual record had been developed and exhaustion was, in part, futile on this basis).

3. 20 U.S.C. § 1414 provides that a child must be fully and individually evaluated prior to being deemed a child with a disability and consequently eligible for special education and related services under the Act. 20 U.S.C. § 1414(b) provides that in conducting an initial evaluation, a local educational agency must use a variety of assessment tools and strategies to gather relevant information, use technically sound instruments and not use any single procedure as the sole criterion.

4. Indeed, under IDEA, the role of the court cannot be properly performed absent initial factfinding by an administrative body. 20 U.S.C. § 1415(i) provides that in a civil action brought under IDEA, the court:

> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Further, the court is to give "due weight" to the administrative proceedings, and although it may accept or reject the administrative body's findings, it "must be careful not to substitute its judgment about proper education methods for that of the state educational authorities." *Jonathan G. v. Lower Merion School Dist.,* 955 F.Supp. 413 (E.D.Pa.1997) (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206–207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982))

process procedures so that state and local agencies can take "primary responsibility for formulating the education to be accorded to a handicapped child." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 283 (3d Cir.1996) (*quoting Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). The basis of Plaintiff's claim is presumably that the Defendant failed to identify her as a disabled child and provide appropriate services, and notwithstanding that she seeks only damages via § 1983 as opposed to injunctive relief, the highly factual nature of the appropriateness of Plaintiff's education is within the peculiar expertise of the administrative body. *See Joseph M. v. Southeast Delco School Dist.*, C.A. No. 99–4645, 2001 WL 283154, *8, 2001 U.S. Dist. LEXIS 2994, *24 (E.D.Pa. March 19, 2001) (exhaustion is typically required when complaints concern the identification, evaluation, educational placement, or provision of a free appropriate public education to a child; in contrast, exhaustion is not required when a complaint concerns the failure to implement an IEP because it is not within the peculiar expertise of a hearing officer). Accordingly, despite the relief that Plaintiff requests, her claim presents issues that should be submitted to an administrative body in the first instance. Fundamentally, we would "do well to allow state officials with expertise in the education of handicapped children to conduct factfinding" regarding these issues before engaging in it ourselves. *Falzett*, 150 F.Supp.2d at 704.

Ultimately, the *Falzett* court required exhaustion because the Plaintiff, in addition to monetary damages, sought relief that an administrative tribunal could provide but resisted the temptation to reach a broader conclusion:

> [t]he court is tempted to conclude that recourse to IDEA administrative procedures is required prior to the filing of a civil action seeking to vindicate the edu-

cational rights of a handicapped child whenever those administrative procedures are capable of providing relief to the plaintiff ... It is also consistent with [*Matula*], which excused exhaustion where the plaintiffs could receive no relief whatsoever through the available administrative processes. It is likewise supported by the Supreme Court's recent *Booth* decision holding that a prisoner seeking only monetary damages must exhaust the administrative process even where damages are unavailable, so long as that process is capable of providing the prisoner some relief.

*Falzett*, 150 F.Supp.2d at 706 (internal citations omitted). In *Richter v. School District of the City of Erie*, Civ. A. No. 01–152 Erie, 2002 WL 655674 at *5–7 (W.D.Pa. March 25, 2002), we were presented with similar facts and likewise narrowly held that exhaustion was required because the Plaintiff sought relief that an administrative tribunal could provide in addition to monetary damages. The instant case is different because Plaintiff seeks solely monetary damages, a form of relief that an administrative tribunal unquestionably cannot provide. For the reasons we have already stated, however, we find that the remedy Plaintiff seeks does not alone make this case analogous to *Matula*.

In this instance, we find that Plaintiff has failed to demonstrate that resort to the available administrative remedies would be futile. Unlike *Matula*, in which all of the rights that could have been obtained through the administrative process had been pursued and settled by a binding settlement agreement, there is relief that could be obtained through the administrative process in this case that has not been pursued. Under IDEA and its implementing regulations, Plaintiff has the right to request an administrative hearing concerning the Defendant's compliance with its child find obligations, and the hearing officer has the ability to order that the

school district provide compensatory education if it is ultimately determined that a school failed to identify a disabled child and to provide that child with a free appropriate public education. *See Frith v. Galeton Area School Dist.,* 900 F.Supp. 706, 714 (M.D.Pa.1995) (19–year–old had right to file administrative claims for compensatory education alleging that defendants failed to take reasonable steps to identify him as an exceptional child while he was enrolled in school); *see also Corpus Christi Indep. Sch. Dist.,* 31 IDELR 41 (1991) (parent's claim for compensatory education was premature in light of fact that child had not been determined eligible for special education services; school district was ordered to assess the student in all suspected areas of disability as soon as practicable).

As noted above, the Third Circuit in *Matula* held that IDEA's exhaustion requirement cannot be circumvented merely by casting an IDEA claim as a § 1983 claim predicated on IDEA. *Matula,* 67 F.3d at 495. Yet in this action, by requesting only damages and claiming that Plaintiff's current educational placement is sufficient, Plaintiff is attempting to do just that. A similar claim was addressed by the Court of Appeals for the Seventh Circuit in *Charlie F. v. Bd. of Educ. of Skokie School Dist.,* 98 F.3d 989 (7th Cir.1996). As in this case, the parents sought only damages to redress the alleged prior educational mistreatment of their child. The Court expressed its conceptual difficulty with this claim:

Charlie's parents believe that his current educational program is apt, which they think means that any psychological services would not be "required to assist [Charlie] to benefit from special education." Yet the complaint they filed on his behalf deals with acts that have both an educational source and an adverse educational consequence; the complaint contends that his education has suffered as a result of the events in fourth grade; if he is doing fine in school today, then it is hard to see what this case is about . . . Perhaps Charlie's adverse reaction to the events of the fourth grade cannot be overcome by services available under the IDEA and the regulations, so that in the end money is the only balm. But parents cannot know that without asking, any more than we can.

*Id.* at 993. Similarly here, Plaintiff contends that her education suffered as a result of events occurring in the seventh grade and that she was a disabled child within the meaning of IDEA. Nonetheless, she has elected to forego remedies available under IDEA that might compensate her for her alleged loss and has sought, in the first instance, a damage remedy pursuant to § 1983. We find that proceeding in this fashion is contrary IDEA's scheme, under which "educational professionals are supposed to have at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." *Id.*

We therefore reject the notion that the relief a plaintiff requests dictates the answer to the futility issue in any given case. Rather, we hold that prior to bringing an IDEA claim pursuant to § 1983, even in instances when only damages are sought, a plaintiff who is able must utilize the available administrative procedures whenever they are capable of providing relief, even if it is not the relief that the plaintiff would prefer.[5] Exhaustion in such instances

---

5. In *Matula,* the Third Circuit observed by way of example that exhaustion might be excused in an instance where the parents of a deceased child seek damages for a school board's failure to provide services while the child was still alive, and we consequently recognize that there may be some very limited instances in which parents are unable to utilize the administrative process prior to bringing a suit for damages. *Matula,* 67 F.3d at 496. The Court also noted that such excep-

would both permit the educational professionals with the requisite expertise to address the case in the first instance and provide, if necessary for purposes of appeal, a valuable record for the court.[6] Accordingly, we will dismiss Counts IV, V, and VI of the Complaint pursuant to Rule 12(b)(1) for lack of jurisdiction.

### IV. CONCLUSION

For the reasons set forth in this opinion, we will dismiss Counts I, II, and III of Plaintiff's Complaint pursuant to Rule 12(b)(6) for failure to state a claim. We will dismiss Counts IV, V, and VI pursuant to Rule 12(b)(1) for lack of jurisdiction. Because we find for reasons already stated that amending the complaint would not cure its deficiencies, we will deny her motion to amend the complaint as moot.

tions "would be rare indeed," and we do not find that the instant case is one of them. Plaintiff had the opportunity to utilize the administrative process in this case.

6. As indicated *supra,* however, in lieu of utilizing the available administrative procedures, the parties may stipulate to the critical facts that would have formed the focus of the administrative proceedings.